# EXHIBIT "6"

# CHARLES W. GRAHAM, Ph.D., AIA, FRICS

**Forensic Architect & Construction Scientist**
(Licensed to practice architecture and interior design in Texas)




P.O. Box 10294
College Station, TX 77842
(Phone and FAX) 979-764-9761
(E-mail) cwgraham@cox-internet.com

15 March 2005

Ms. Debbie J. Avery
Manager
Campus Development & Services
TSYS Facilities Management
1600 First Avenue
Building A, Ground Floor
Columbus, GA 31902

Re:   TSYS Child Development Center – Interim Report No. 2

Dear Ms. Avery:

     As requested, I have inspected the above facility to determine the cause (s) of the mold growth behind the wallpaper on the perimeter walls of the facility. According to information received in our meetings, the wallpaper had been replaced in a number of areas twice before my visits to the facility, and still the mold has continued to grow. Previous reports of inspections by others, including Mr. Patrick McCabe, of Working Buildings, the indoor air quality specialists, and by Mr. Larry Carter, of Homemaster, the remediation contractor, have covered much of the information in this regard that has been accumulated to date. My initial report of 11 February 2005 also contains information about the mold and moisture problems and suspected causes. Mr. Mike Wells, AIA, the architect-of-record for the facility, has issued a report dated January 21, 2005, on the findings and observations during the first inspection.

     In this present report I will summarize the information that has been acquired to date. My charge, as I understand it, was to determine the sources of the moisture supporting the mold growth, as mold must have moisture to grow. The primary focus of my investigations, then, was to find the moisture sources and to assist the project team in repairing the facility to minimize the potential for mold to grow in the future.

     In the period between my first visit to the site on January 21, 2005, and visits on February 17-18, 2005, additional gypsum drywall, gypsum sheathing and brick veneer has been removed. The areas in which these materials were removed included locations where more limited inspections had been performed on or about January 21, 2005. The exhibit at Tab 2 in the attached notebook contains a map of the areas in which destructive testing was performed on February 17-18, 2005.

Debbie J. Avery
15 March 2005
Page 2

Information received during our inspections and discussions of February 17-18, 2005, was sufficient enough to make decisions for remediation activities to begin as soon as possible. Mr. Mike Wells, AIA, architect-of-record for the facility, will summarize the discussions and decisions made on these dates in a separate report. In this *Interim Report No. 2*, I will address the technical considerations that could affect remediation efforts. Please keep in mind the following points when using this information. First, the design and construction of buildings is not an exact science. I am going to list many construction defects which in and of themselves would generally not cause moisture-related problems for the owner, but in the interest of developing an overall picture of the condition of the facility, I will identify most of the conditions that could contribute to problems.

1.0   Facility Description

The Child Development Center is a one-story facility of approximately 36,000 square feet of area. The plan is a reversed "L" (see Tab 2). The foundation is a concrete slab-on-grade with footings and grade beams at the perimeter. The superstructure is constructed with steel tube columns and beams, with 6" steel studs for infill framing. The walls are constructed with brick veneer on the exterior, a cavity behind the veneer, gypsum sheathing on the exterior of the steel studs, batts insulation between the studs, gypsum wallboard on the interior, and vinyl wallpaper finish on the wallboard. This is fairly standard construction for this type of facility, given certain licensing requirements.

The roof structure is constructed with steel joists supported by steel perimeter beams. On the steel joists is a metal decking, with insulation board and a standing seam metal on the roof. Lay-in acoustical tiles are installed in the ceilings.

The air conditioning system utilizes two heat exchanges on the roof near the apex of the two wings. A 40 ton and a 60 ton unit were installed on the flat roof at the mechanical bay. A variable air volume ducted supply and a ducted return air system distribute air throughout the building. Relative humidity and temperature readings that I took during my two visits to the site found the equipment to be maintaining the temperatures and relative humidity at design comfort levels of 35-60% R.H. and $68^0$-$78^0$ F.

2.0   Background

Architects try to design buildings of high quality, and contractors try to build them of high quality, but on facilities of this size it is virtually impossible to design and construct the facility without some deficiencies. There are too many materials, systems and components to be able to achieve a "perfect" facility. It is for these reasons that we design and construct buildings to include redundancies that serve as secondary lines of defense against potential problems if a primary component or system fails. Nowhere is this more true than at the building envelope, where the exterior climate is moderated to maintain safe and comfortable conditions inside the building.

Debbie J. Avery
15 March 2005
Page 3

    Experience has shown, however, that a failure in one system or component on a building's envelope that is not effectively managed at the level of the redundant system, will almost always cause serious problems for the owner. With moisture-related failures in the cladding system, each episode of leakage into places where the moisture is not supposed to reach becomes cumulative, and in time, failures of the building's systems and components occurs. Indoor air quality and other aspects of the interior environment are also affected.

    It is also important to note that analysis and reporting of problems with a building and their root causes does not necessarily assign blame to any one individual or firm. Contractual arrangements, change orders, standard practices for a locale, and other forms of assignment of duties and responsibilities may be beyond my knowledge and so I can not always identify the party or organization that might have been responsible for certain actions that ultimately contributed to a problem. I would advise you to seek legal counsel in these matters.

    This present report, then, lists the problems that in my professional opinion have brought you to the point today of having mold and moisture problems in this facility. I also need to inform you that I hold no professional licenses in the State of Georgia, so remedial design and construction activities requiring licensed professionals will have to be done under the direction of people so qualified. I have inspected over 8,000 buildings in the United States, Canada, and elsewhere for construction problems, the majority of which have been moisture-related, so I am bringing that experience into my analyses of this facility. I also teach as an architect and construction scientist in the largest College of Architecture and largest Department of Construction Science in the United States, and so I will bring both my professional experience and scientific knowledge to my data collection and analyses of the problems at this facility.

    The basic methodology that I have used in this investigation is a case study analysis technique which is used to build a "chain of evidence" that points to the root causes of problems. Whenever possible, I will triangulate the findings with the literature and with good design and construction practices.

    Having reviewed all of the information available at this time, my professional opinion is that the primary cause of the mold problems in this facility is unmanaged moisture that is finding its way into the cavities of the exterior walls. The sources of this moisture must be eliminated so the mold cannot grow any longer. Further, I believe the mold problems at this facility are the result of one major deficiency, exacerbated by a number of less significant but contributing factors. The primary problem was failure to install a vapor retarder/air barrier on the gypsum sheathing at the back of the wall cavity. In my professional opinion, this is the fundamental deficiency leading to the mold problems.

    Before explaining these and other problems with the facility, I would like to explain how mold grows in nature and in buildings. For mold to grow in any environment, four conditions must be satisfied. If any one of these is not satisfied, then the mold spores, if present, will remain dormant until that condition is met and they can create active colonies. These conditions are:

Debbie J. [illegible]
15 March 2005
Page 4

1. <u>Mold spores must be present.</u> Mold spores are ubiquitous and are a part of the natural ecosystem. They are always with us. It is impractical to assume one can cost effectively remove all mold spores in a building environment except in very rare instances (e.g. operating rooms in hospitals, where mold, fungi, and bacteria can not be allowed to be present). The goal for building usage is to keep the concentrations to tolerable levels, and to keep the spores that are present in their inactive state so they cannot give off allergins or toxic gases.

2. <u>A food supply must be available for mold to grow.</u> The food sources for mold may be any one or more of the following: building materials such as carpet; the paper faces on gypsum wallboard (interior drywall and exterior sheathing); wood; carpet; carpet pad; vapor retarders on batts insulation; ceiling tiles; and, other similar hygroscopic materials. To grow, the mold spores must consume the paper, starches, cellulose and other elements from these materials as food sources.

3. <u>The temperature of the host environment must be in a range conducive to support mold growth.</u> Most mold species grow at the same temperatures that human beings live in, namely $40°F$-$110°F$. They are especially active at the temperatures we like to operate our buildings at: approximately $68°F$-$76°F$. We can kill the mold spores, or make them go dormant, by making the temperature of the environment go well below or well above the range in which they are active, however, again, these would be extremes that humans do not find comfortable.

4. <u>Moisture must be present for mold to grow.</u> Mold spores acquire the moisture they need to grow from the substrate materials they are residing in or on. As they do not have respiratory systems, molds must get their moisture through their hyphae (root stems) from condensation, leakage, or absorption into the substrate materials upon which they reside. Moisture can be made available in the materials by condensation, atmospheric relative humidity, or bulk water leakage. It is at this point in their life cycle that we try to intervene in buildings, namely, to keep the moisture from coming into contact with the extant mold spores. We must try to keep the moisture away from the spores in a variety of ways, most of which have been known for decades.

Inspections of this facility in the past couple of months have found that moisture is getting into the wall cavities and staying there long enough for mold to grow. In addition to supporting mold growth, this moisture is also causing the rusting and corrosion of ferrous metals such as fasteners, steel studs and steel framing in the perimeter wall systems of this facility.

As stated previously, my professional opinion is that the single most import causative factor for the mold growth in this building's perimeter walls was failure to install an adequate vapor retarder at the back of the cavity behind the brick veneer. My inspections indicate that a very leaky brick veneer is letting excessive amounts of liquid water and vapor moisture get past it into the wall cavity. The mortar appears to be an air entrained mortar and therefore it is very porous. Also, the mortar did not bond well with the bricks, as evidenced from my visual inspections, and inspections using a masonry microscope. I could not find signs of a water repellant applied to the brick, although it was specified. Further information will be needed to confirm whether or not a water repellant was applied to the brick.

Debbie I. Avery
15 March 2005
Page 5

Based on my experience, mortar-to-brick bonds will occur at about 75% of the interfaces on the average masonry job. When the bricks are laid too dry and a high initial rate of absorption occurs, when the mortar is too dry, when the mason does not use good buttering techniques for the mortar application, and/or when the placement of the bricks is not done with adequate pressure, the bonds between the mortar and brick will not develop. On this facility, I would estimate that the bonds occurred about 50-60% of the time. The masons also failed to completely fill the head joints with mortar as specified. Altogether, the porous mortar, the poor percentage of mortar-to-brick bonds, and incomplete filling of head joints are allowing the walls on this facility to be leakier than industry standards.

One should note that masonry walls will always leak water, however, and the head joints usually leaking the worst. Visual inspection of the head joints on this project found that the masons did not fill the head joints as specified (see photo 1.11 at Tab 1). Water spray testing with a garden fan sprayer operated at low water pressure found that water leaked into the head joints within 1 minute. The bed joints were leaking too, which is also common, but they too are allowing more leakage than is normal.

Behind the brick veneer, there are extensive accumulations of mortar droppings in the cavity. Mortar has piled up on the wall ties, in random areas around the walls, and at wall bases at the masonry lug. A mortar netting material was used to catch the mortar droppings at the bases of the walls, but even with this material, the quantity of mortar was so great bridges between the brick and gypsum sheathing occurred. These mortar bridges function to transport the water leakage past the brick directly to the gypsum wall sheathing where it is absorbed and finds its way into the inner spaces of the walls.

The gypsum sheathing was installed without any of the joints being sealed, and cuts, penetrations and other breaches in the sheathing were also left unsealed. Gypsum sheathing is rated by most manufacturers for a maximum of 30 days exposure, and, it is not to be exposed directly to water (see Tab 3). Gold Bond ™ brand gypsum sheathing should be covered, for example, with building felt or equivalent within 30 days of installation on the building (page 27).

Once in place, experience has shown that gypsum sheathing can grow mold if it is left in contact with moisture in the wall cavity for too long (see Tab 4). This is why a vapor retarder/air barrier must be installed at the back of the cavity, over the gypsum sheathing, to give the sheathing redundancy (see Tab 7).

The mortar bridges in the wall cavities come into direct contact with the wall sheathing, allowing moisture to travel across the bridge to the sheathing where it is absorbed into the sheathing. Air currents also carry this moisture in the wall cavities from one location to another by air infiltration, exfiltration, and stack effect. These are common phenomena in the wall cavity environment, but they can be exacerbated by the air conditioning system which, in this facility, is putting the building in a vacuum for extended periods of time. A test procedure on January 21, 2005, using a dust puffer, showed how quickly the air moved out of the cavity into the interior spaces. The air quality specialist and the remediation contactor had both observed negative

Debbie J. Avery
15 March 2005
Page 6

pressures on the building during their prior inspections so their reports can be consulted for further information about this observation.

When liquid water gets past the outer rainscreen, the brick veneer in this case, it must be caught by through-wall flashing as it drains down the wall (see Tab 7). This flashing is normally installed at the heads of all openings such as at doors and windows, and at window sills, to catch the drainage and divert it directly to the exterior of the building through weep holes. Inspection of the flashings on this facility found that they did not extend from the back of the cavity to the outer edge of the brick veneer (see photos 1.6, 1.8, 1.9, 1.55, 1.82), and they do not have end dams formed in them to catch water that would otherwise drain off the ends of the flashing into the cavity. Unfortunately too, weep holes are either missing, or when present, they were often spaced at distances greater than the 32" o.c. specified by the architect. On this facility, then, no effective way is provided to redirect the water leakage to the exterior once it gets past the brick.

The vapor retarder on the batts insulation was installed towards the interior of the building, so it can not assist with inhibiting moisture migration towards the interior of the building either. The 30 year climate normals for the Columbus, Georgia area show that the average annual rainfall is 48.57 inches, the number of heating degree days (HDD) is 2,153, and the number of cooling degree days (CDD) is 2,297 (see Tab 5). The International Energy Conservation Code (IECC) has designated Muscogee and Chattahoochee Counties, where Columbus is located, as "hot-humid" counties. Section 502 of the IECC states that these counties are an exception to the requirement for a vapor retarder with a permeance rating of 1 or less to be installed on the warm-in-winter side of the wall. Paragraph 502.1.1, however, says "The design shall not create conditions of accelerated deterioration from moisture condensation." While the potential for condensation is low, the potential for water leakage into the wall cavities is high because of the high rainfall rates and because of the poor condition of the brick veneer which is acting like a leaky rainscreen, so a drainage plane (i.e. vapor retarder/air barrier) would still be required at the cavity behind the brick veneer. The merits of having the vapor retarder for a proper moisture management system are given in the paper on moisture management at Tab 7. I have attached one of my publications on moisture management at the building envelope, and another on vapor retarders and air barriers at Tab 8 in the notebook.

The water leakage into the walls is absorbed into the materials in the wall cavity. The warmer temperatures on the exterior of the building, especially during the summer months, drive the moisture towards the interior of the building. This is a common phenomenon, often referred to as "vapor drive." The basic principle behind vapor drive is that moisture is pushed away from the environment with the higher temperature because the atmospheric pressure is slightly higher there than in adjoining environments with lower temperatures. Installation of vinyl wallpaper on the gypsum drywall on all the perimeter walls at this facility impeded evaporation of this water to the interior. The result was that moisture, primarily from leakage, was trapped in the walls and extensive mold growth has occurred on every layer of the building's wall materials from the outside to the interior.

After considerable discussion and research by the building team, it is my conclusion that the only way to effectively remediate the mold, which is scattered throughout the perimeter

Debbie J. Avery
15 March 2005
Page 7

walls, is to remove the brick veneer, the gypsum sheathing, the batts insulation and other components down to the basic structure, clean and treat the mold, and then rebuild the exterior walls using proven techniques to manage the liquid water and vapor moisture that the building envelope will be exposed to over its useful life. Patrick McCabe and his team at WorkingBuildings will have to write the detailed protocols for the mold remediation work as I am just laying out the general description of what needs to be done to limit moisture intrusion.

Extensive efforts were made to find a way to do all of the work from inside the building, leaving the brick veneer in place and re-anchoring it to the studwalls, but after removal of the brick, sheathing, insulation and drywall was performed just prior to the inspections on February 17-18, 2005, it became clear that there are areas of the building that cannot be reached to be positively remediated with a high level of certainty. The facility management team has stressed that they want to make sure that the facility has a healthy environment for occupancy once the remediation work is done. Accordingly, it is my recommendation to remove all of the materials down to the basic structure at the perimeter walls. It is unfortunate that there is not another way to address the problems with the walls and the water leakage into them, but my experience has been that this is not possible in cases such as these.

I believe there is general agreement among the members of the remediation team too that the air conditioning systems should be upgraded with some automatic controls on the return air system to keep the system from putting a negative pressure on the building. A request was made of the Trane Company, manufacturers of the air conditioning equipment, to study the ability of the systems to maintain humidity levels in the range of 40-60% for delivered air into the spaces when the variable air volume system modulates the supply of air to the spaces. The analyses (see Tab 6) show that the equipment can do this down to at least a 50% supply volume, a performance level which the team feels the equipment will probably never reach. It is recommendated, then, that pressure-controlled damper systems be installed on the return air sides of both air conditioning units. It was also recommended that ultraviolet lights be added to the coils to further reduce the chances for fungal growth on the cooling coils. The mechanical engineer for the facility is looking into these matters and will report to the team in the near future as to what the costs, installation, and maintenance issues will be.

3.0    Review of Water Management Details in the Drawings and Specifications

The following table was prepared to identify the drawings and specifications that relate to moisture management on the building envelope. Remarks about the applicable drawings and specifications are given, including when they are missing or are not clear. No special significance is given to the order of the items listed, as they were made for convenience in preparation of this report.

Debbie J. Avery
15 March 2005
Page 8

| Item No. | Item | Applicable Drawing (s) | Applicable Specification (s) | Level of Potential Impact for Moisture-Related Damage | Remarks |
|---|---|---|---|---|---|
| | **FOUNDATION** | | | | |
| | Moisture Barrier | X | 03310 (2.7) | High | No moist. Barrier shown on structural or architectural drawings; CRSI Manual of Standard Practice and ACI 318 referenced; 6 mil. Polyethylene spec'd |
| | **BRICK VENEER** | | | | |
| | Brick- Materials | N/A | 04210 (2.0) | Low | Moderate weather climate |
| | Brick- Mortar | N/A | 04100 (2.1, 2.2) | Medium | Masonry cement not allowed as per specs. |
| | Brick- Appearance | A4.01; A4.02 | 04210 (3.2) | Very low | |
| | Flashing- Wall Base | 3, 4 A5.02 | 04210 (2.4, 3.7) | High | Flashing required to extend to wall face in all locations |
| | Flashing- Rowlock Sills at Windows | 1 A3.02 | 04210 (3.2) | High | Brick rowlock overhangs are shown on the drawings but they should have been dimensioned; flashing and weep holes should have been noted on details but are spec'd |
| | Flashing- Window/Door Heads | 4 A5.02; 1,2,3 A3.02 | 04210 (3.7) | High | Back and end dams are required in both drawings and specs. |
| | Steel Lintels at Windows | 4 A5.02 | 04210 (3.6) | Low | Should have been drawn on 2 A3.02, but shown on drawings and spec'd elsewhere |
| | Expansion Joints in Brick | A4.01; A4.02 | 04210 (3.5); 07900 | Moderate | |
| | Brick- Water Repellant | N/A | 07190 | Low | As per BIA, not needed if quality masonry provided; was spec'd, however |
| | Brick Screen Walls | 4, 5 A1.02 | 04100, 04210 | Low | Moisture dam missing beneath caps; is an aesthetic problem; in time could lead to deterioration of brick |

Debbie J. Avery
15 March 2005
Page 9

| | | | | | from freeze-thaw cycles |
|---|---|---|---|---|---|
| | Brick- Weep Holes | 2 A3.02 | 04210 (3.7) | Moderate | Some weeps missing, some below sidewalks; are essential for moisture management |
| | Brick/Mortar Workmanship | N/A | 04210 (3.2) | High | BIA standards/practices referenced for quality control and workmanship |
| | **WINDOWS** | | | | |
| | Glass Block Windows- Installation | 1 A2.03 | X | Moderate | Need flexible exp. Jts. One side and top; no details, other than plan view, sections or elevations provided; no spec. provided |
| | Windows- Closure Strips | 1, 2, 3 A3.02 | 08410 (2.3) | High | Closures strips required by spec. and as drawn |
| | Windows- Attachment to Steel Studs | X | 08410 (2.2, 3.2) | Moderate | Screws/anchor bolts must be sealed as per specs., window mfr's website |
| | Windows- Attachment to Steel Lintels | X | 08410 (2.2, 3.2) | Moderate | Ditto above |
| | Windows- Expansion Joints | 1, 2, 3 A3.02 | 08410 (2.6); 07900 | High | Fillet joints not allowed as per drawings and specs. |
| | Windows- Glazing/Gaskets | N/A | 08800 (2.3, 2.4, 3.3) | High | Gaskets missing on many windows as installed; specs. Require tight fitting gaskets with no gaps |
| | Windows- Sub-sill | 1, 5A3.02 | 08410 (2.3) | Very High | Drawings and specs. Require back and end dams; is primary redundant system for leaks around windows |
| | **MOISTURE CONTROL** | | | | |
| | Vapor Retarder behind Cavity | 4, 12 A2.03; 1, 2, 3 A3.02 | 04210 (3.7); 07110 (1.1); 07900 | Very High | Required behind veneer finish material in drawings and specs. Also, required at all penetrations such as at brick ties as per manufacturers |
| | Gypsum Sheathing- Installation | N/A | 09250 (3.3) | High | Gypsum Association application standards referenced; all edges to be protected where gypsum core is exposed as per specs, mfrs. |

Debbie J. Avery
15 March 2005
Page 10

| | | | | | |
|---|---|---|---|---|---|
| **ROOFING** | | | | | |
| Coping Caps- Materials | 1, 2 A5.03 | 07500 (2.09) | High | Concealed clips for sheet metal copings spec'd. felt required under coping cap as per specs.; no note on drawings |
| Coping Caps- Expansion Joints | X | 07600 (3.0) | High | No detail provided; SMACNA standards apply as per spec. |
| Moisture Barrier | X | 07500 (2.08) | High | |
| **GUTTERS/DOWNSPOUTS** | | | | | |
| Materials | X | 07600 (3.0) | Low | SMACNA requirements specified |
| Design | 1, 4, 6 A1.06 | 07600 (3.03) | Moderate | Scupper needs flashing/counter-flashing at heads, throat at parapet; shop drawings required as per specs. |
| | | | | NOTES: | 1. Precedence: Technical specifications (highest); large scale drawings (middle); small scale drawings (lowest) 2. N/A = not applicable 3. X = Not provided |

4.0   Test Equipment Used

The following test equipment was used in the preparation of this report. Descriptions of the equipment and its use are provided.

   4.1   Wagner Moisture Meter, Model L606 (see Tab 12 for description)
   4.2   Protimeter Digital Moisture Meter (see Tab 12 for description)
   4.3   Fan sprayer (see Tab 12 for description)
   4.4   Masonry microscope (see Tab 12 for description)

5.0   Reports Reviewed in Preparation of this Report

The following reports or information items produced by others were reviewed in preparation of this report:

Debbie J. Avery
15 March 2005
Page 11

    5.1 Air Moving Equipment Test Sheets, by NEBB, August 31, 2001 (16 pages total)
    5.2 WorkingBuildings Report of January 26, 2005 (8 pages total)
    5.3 TSYS Thermal Evaluation, Daycare Center, November 19, 2004, by Bowles Construction
    5.4 Digital photographs taken by HomeMaster during demolition work for the inspections, dated 2/9/05 and 2/15/05

6.0    Recommendations and Conclusions

    6.1    Recommendations

        6.1.1    A number of construction defects or maintenance problems that need to be addressed were discovered during our inspection of January 21, 2005. In some cases these would be related to the moisture-related mold problems, in others they might not be, but I wanted to make sure you were aware of them in terms of the overall condition of the building. These are included with a summary of the items mentioned previously. As before, these are not listed in any order of significance.

            6.1.1.1    Window gaskets are missing on a number of windows. This will allow water to leak into the wall framing so they need to be installed. Gaskets with gaps in them should be replaced or sealed according to the architect's original specifications.

            6.1.1.2    A number of recessed light fixtures at entrance vestibules were dislocated from their positions. These could pose a safety hazard and need to be reattached.

            6.1.1.3    Flashings in a number of places that were visible did not go to the ends of windows. In one location at the front of the building, the steel lintels did not continue across an opening and so the brick were not supported by the lintel. These should be repaired during remediation work.

            6.1.1.4    There is no space between the 6" x 6" steel columns and the gypsum sheathing on the exterior side of the wall and the gypsum wallboard on the interior side of the wall. The result has been that the moisture accumulating in the wall cavities has condensed on the steel columns, causing abnormal rates of rusting. Mold concentrations on the inside of the wall were higher in these locations than elsewhere too. These columns need to have a thermal break between them and any wall finishes on both sides of the wall. A furred pilaster formed with light gauge steel framing should be formed around these members, and insulation –board or batts as appropriate - should be installed around the columns within the pilaster.

            6.1.1.5    Rusting of welds and bolts needs to be addressed. While the existing bolts and welds may be capable of carrying their loads, my concern is that their service life could be shortened if they

Debbie J. Avery
15 March 2005
Page 12

are allowed to continue rusting. Paragraph 2.3 (A) in Section 05100, and Paragraph 3.1 (B, E) of Section 05200 in the specifications require cleaning of welds and touching up of shop applied paint following erection of structural members. In at least one location, a field alteration was made to a beam and the weld holding the beam in place was only at the top of the beam. Paragraph 3.2 (G) of Section 05100 of the specifications prohibit the use of gas cutting procedures in the field for correcting fabrication errors. Close inspection of the welds overall shows that they were not cleaned of slag when the welds were performed, and no spot/field priming was done. It is recommended that all of these welds be cleaned and primer/paint coatings be provided as originally specified to minimize the potential for continued rusting. The rusted bolts should be removed and replaced with high strength bolts as specified with a rust preventative coating (e.g. cadmium plating or other as approved by the engineer). In a high rainfall location such as Columbus, it is good insurance to protect the structural members from moisture as much as possible.

6.1.1.6  Windows were installed without the required shims as are standard industry practice, and fasteners were installed unsealed. Closure panels were also left out of the windows, even though they were drawn in the architect's drawings, they were specified, and the shop drawings called for them. Inspection of the windows during our testing revealed that only one self-tapping screw fastener per frame side of each window was typically installed. This fastener has to span across a space of over 2", forcing the fastener to carry wind loads it is not designed to handle. My concern is that the windows could be extracted from their locations during a high wind storm such as during a hurricane. The closure panels and shims are meant to give the frames strength, and, in the case of moisture management, to direct water leakage past the gaskets, which will sometimes occur, down the wall to the sub-sill where it can be directed to the exterior of the building. It is recommended that all windows be removed, closure panels be added to them as per the drawings, specifications and shop drawings, and approved shims and fasteners be used to properly affix the windows for wind and water resistance.

6.1.1.7  Sprinkler heads were installed too close to the walls. A good rule-of-thumb is to locate sprinkler heads of the spray type no closer to walls than about 5 feet. When the heads are closer than this, they should be bubbler heads or soaker heads and not spray heads. Spray heads contribute spray to the air around them and this spray can be wind swept onto walls. Water can

Debbie J. Avery
15 March 2005
Page 13

                  then enter any openings or cracks in the walls and potentially contribute to future mold problems. This is not a serious problem, but one that needs to be addressed to remove one more potential water source inside the facility.

6.1.1.8  All of the brick screen walls and pilasters need to have a flashing intalled beneath the top course of masonry. Extensive and unsightly efflourescence is present on the wall surfaces because the bricks are leaking water at the top of the wall. This water is draining down the wall until it finds a point of exit, where it evaporates and leaves behind the salts it carried there in solution. Other options to address this would be a cement wash at the top of the wall, or a new coping with a flashing or membrane beneath it.

6.1.1.9  Cavity widths between the brick veneer and the gypsum sheathing are inadequate in places. A 2" wide cavity is recommended by the Brick Industry Association of America (BIA). When the cavity is smaller than this, it becomes more difficult to keep the cavities clean of mortar. It is unclear why the cavities on this project vary from ¾"-1 ½" except perhaps that is what was required to square up the lines when the masonry was laid. Under any circumstances, however, the specifications called for efforts to keep the cavities clean of mortar and other debris and it would appear very little effort was made to do this. When the remedial work is undertaken, this should be a detail that is watched very closely.

6.1.1.10  Weep hole design should be changed from tubes to open head joints. Research has shown that the open head joint is still the best type of weep system to use in brick veneers. The BIA Technical Notes 7 and 21B allow the use of ¼" diameter holes, or rope wicks, if spaced at 24" or 16" o.c. respectively, but again, research has shown that weepage works better when the head joint is left open between the head joints of the masonry units at the spacings indicated by the architect. Where the first course of masonry is below an adjacent, exterior porch or sidewalk, the collar joint should be filled with mortar or grout and the flashing and weep holes should be located above the exterior surface for positive drainage of the wall cavity. The Tech Notes can be accessed at http://www.bia.org/BIA/technotes/t7.htm for recommendations as to how to do this.

6.1.1.11  Mortar should be Portland Cement mortar with lime and aggregates as specified. Masonry cement should not be used. This was included in the architect's specifications and it is a recommendation that I would agree with. Research has shown that Portland Cement/lime mortars are less porous and allow

Debbie J. Avery
15 March 2005
Page 14

| | |
|---|---|
| | less moisture to pass through them. These mortars also bond to brick better. When the remedial work is done, the architect's original specification should be followed. |
| 6.1.1.12 | The sub-sills should be installed as detailed by the architect and as indicated on the window fabricator's shop drawings. This includes use of shims, backer rod and caulk sealant beneath the sills to waterproof the assembly. Sitting the sub-sills onto the brick rowlock sills without a sealant or physical barrier allows wind-driven rainfall to enter the wall cavity. |
| 6.1.1.13 | All penetrations through the brick, such as by plumbing pipes, electrical wires, or for fixtures, should be sealed to keep water out of the walls. The specifications contain the requirements for all sealant work of this nature. |
| 6.1.1.14 | The glass block windows on this project were installed with mortar heads, jambs and sills. The architect's details are incomplete on this matter, as vertical sections through these window types were not provided. Glass block windows have different expansion and contraction coefficients than fired clay brick. Accordingly, they should have an expansion joint on at least one side of the window and at the top of the window. An approved flashing should be installed above these windows. On this project, polyethylene film was used as a flashing above the glass block windows. This is not an approved flashing material. If glass block windows are to be kept in the remedial work, they should be installed according to the manufacturer's requirements, they should be installed to allow for differential movement coefficients, and they should be flashed properly. |
| 6.1.1.15 | The batts insulation in the walls was not installed according to the specifications or according to good industry practices. In Section 07210, at 3.2 (c), the paper on the batts was to be installed with ends neatly butted and taped, and side flanges lapped over the faces of the studs. All tears and cuts were to be sealed. The purpose of this is to develop an air barrier in the wall system, which ultimately adds to the performance of the material as insulation. The batts observed during the testing was installed loosely, the flanges were not fitted over the stud faces and penetrations were not taped, so air infiltration and exfiltration within the all cavities were facilitated. The insulation should be installed as per the specifications during remedial work at the perimeter walls. |
| 6.1.1.16 | A variety of screw types were used to affix the gutters. In a number of locations, unprotected screws were rusting rather dramatically. All fasteners should be compatible with the gutter material to minimize galvanic action, and, they should have a compatible rust-resistive coating on them. |

Debbie J. Avery
15 March 2005
Page 15

6.1.1.17  The metal parapet copings should have standing seam expansion joints installed in them according to the SMACNA recommendations as outlined in the specifications. The joints on the current copings were covered with a plate that has a caulk bead applied on either side of the joint between the materials. Experience has shown that this type of joint will eventually fail and wind-driven rain can get into the wall cavity. The copings will need to be repaired following the SMACNA guidelines.

6.1.1.18  The moisture barrier should extend over the top of the parapet wall, beneath the metal coping, and approved clips and fasteners should be used to affix the coping to the parapets. Screws fastened through the side flanges of the copings were observed in places and these are not as good as clips. Penetrations through critical elements such as parapet copings provide another opportunity for a future leak so these should be minimized as much as possible.

6.1.1.19  Locations were landscaping has developed to elevations too high to allow for drainage of water away from the building should be reworked. The civil engineer will need to be involved in observing this rework to make sure positive drainage is provided away from the building.

6.1.1.20  The potential for ghosting at the steel studs needs to be addressed. Gypsum wallboard installed directly to steel studs, over time, will develop gray lines or shadows on the surface of the wall. This is because of the difference in moisture content of the wallboard where it is in contact with the metal studs, which have a high rate of conductance. A thermal break needs to be installed between the gypsum wallboard and the steel studs. Insulating tapes, for example, are available to do this.

6.1.1.21  Finishes on the interior of the building, while durable, must also allow moisture to evaporate through them. Wallpapers that allow vapor diffusion through them are available. Wallpapers that do not have a vapor diffusion potential can still be used if perforated. Tools for perforating the wallpaper are available. Paints should also have a high vapor potential. Avoid the use of elastomeric or polybutylene paints, even though they are durable. Wallpapers and paints should have a perm rating of at least 5, with higher numbers being better.

6.1.1.22  The structural engineer's specifications called for fiber reinforcing for slabs-on-grade in Section 03200, Paragraph 3.3. An approved fiber supplier is Fibermesh, Inc., of Chattanooga, Tennessee. The dosage rate of application was to be 1.5 pounds of fibers per cubic yard of concrete in lieu of conventional temperature steel. A copy of the Fibermesh 300 Product Data

Debbie J. Avery
15 March 2005
Page 16

Sheet is provided in the notebook at Tab 11. The structural drawings, however, still contain symbols and notes for welded wire fabric in the slab, even with this requirement. The SI Concrete Systems company that makes Fibermesh notes in their literature that these fibers are not meant to replace any moment or structural steel. Further, they should not be used for crack control from external stresses, though this is not defined in the literature. Analyses of the structural drawings would suggest that questions arise as to how reinforcing was handled at drops in the slab as indicated on the drawings, if the reinforcing steel in the slab was omitted in lieu of the fibers. Apparently there are no shop drawings or field notes that document these issues, although efforts are underway to find them. In my discussions with engineers over the years, and having once owned a foundation construction company myself, I would not recommend this practice as differential movements in the soils or changes in the way the facility is loaded structurally could be affected by the absence of moment or structural steel. It is too late to do anything now, but I would notify the structural engineer of this matter for future problems that may arise. At the very least, if the fibers were to replace the temperature steel in the deck of the slab, then the welded wire fabric should not have been drawn on the structural drawings. The welded wire fabric was left out of the slab by the contractor, however, and so it appears it was meant to be a substitute for it, which I believe is a mistake that will cause problems later on in a variety of ways.

6.2   Conclusions

Graham's Rule of Moisture in Building Design and Construction states that "it is a statistical probability that water will leak past the outer rainscreen on all buildings at some time in their life." The key to managing that water so it cannot cause damage to building components is to have a redundant system that can collect the water as directly and quickly as possible and redirect it back to the exterior. Even though the brick veneer wall system on this building is "leaky," it would not necessarily be a problem if the vapor retarder/air barrier had been in place at the back of the cavity, if flashings and window units with closure panels and sub-sills had been installed, and if the weep system had been installed properly (correct spacing and clean of debris).

Excessive mortar droppings in the wall cavity, while not good workmanship, would not have been as big a problem as it is if the vapor retarder/air barrier had been in place, and if the penetrations through the gypsum sheathing had been sealed. It is also a required practice to seal the penetrations caused by the fasteners at the wall ties. Grace Construction Products has a good technical bulletin in this regard as it explains how to

Debbie J. Avery
15 March 2005
Page 17

properly install a moisture membrane on a wall, including over the wall ties. This document has been provided at Tab 9 in the notebook. I have also enclosed a copy of two photographs taken recently at a building within one mile of my home in College Station, Texas at Tab 10. One photograph shows the gypsum sheathing without the moisture membrane on it, and the other shows the membrane installed on it. College Station, Texas gets about 36 inches of rainfall per year, and it is in a hot-humid climate zone like Columbus, Georgia. All architects in the area, to my knowledge, specify use of and contractors install a moisture membrane on the sheathing and over wall tie penetrations. As has been stated previously, failure to install the moisture membrane specified by the architect on the Child Development Center was the single, most significant cause of the problems. Failure to provide other components in the water management system added to the problems. The only way I know to address this problem now is to remove the brick veneer, gypsum sheathing, batts insulation, gypsum wallboard, and vinyl wall paper, then, rebuild the exterior cladding system as drawn and specified by the architect. Based on my experience, the wall cavities are presently contaminated with mold spores which have probably drifted far from the most visible and easiest-to-access locations, and so the exterior walls must be opened up for remediation to occur with any degree of certainty to satisfy air quality goals. Replacement work must be done according to a closely detailed and coordinated plan for quality control of materials, equipment and workmanship. Finally, all work must be done to satisfy the building codes, which are minimum requirements. In some cases, the minimums should be exceeded (e.g. where the vapor barrier is required) because of site conditions. All work must be done by experience people with the coordination of properly licensed and certified professionals.

7.0   Report Limitations

7.1 Hazardous Materials: No attempt was made during my investigations to identify carcinogens, toxins or other hazardous substances or materials that may be present on the property. My training, education and experience do not include a background in these areas. Other professionals will have to be consulted for these services. Experts with the appropriate credentials should be consulted for the potential impact of mold, should it be present, on the health of humans and animals, and for its remediation.

7.2 Changing Site Conditions: Changing weather, changing uses of facilities, changing physical conditions of buildings and surroundings, and other similar factors can change the condition of properties. My report is of the conditions observed at the dates and times indicated. Physical conditions of the site, building systems, or equipment may be different at other times.

7.3 Photographs: All photographs are true and correct as they were taken. Changes made to the digital photographs were made on the computer to improve color, contrast and brightness to enhance legibility or clarity. Substantive content of the photographs was not altered.

7.4 Professional Opinions: The review of building conditions and the definition of potential causes of problems often requires much subjective and professional judgment. Therefore, opinions may vary even among professionals. I have provided my judgments based on my professional knowledge, information, and belief, and I

Debbie J. Avery
15 March 2005
Page 18

have employed a reasonable standard of care typical for professionals providing similar services. I would reserve the right to change this report if new information becomes available.

Sincerely,

*Charles W. Graham*

Charles W. Graham, Ph.D., A.I.A., F.R.I.C.S.

Attachment: Notebook with 12 tabs dated 15 March 2005