1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNTIED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

COPY

STATE AUTO PROPERTY &

CASUALTY INSURANCE COMPANY          PLAINTIFF


Vs.                                 CIVIL ACTION CASE

                                    NUMBER 3:06-CV-DRB

STILLWELL MASONRY COMPANY, INC.,   DEFENDANT




    The deposition of PAUL ALTON STILLWELL,

taken by the Plaintiff, before Russell D. Anderson,

a Georgia Certified Court Reporter, at the Columbus

Consolidated Government Center, 7th Floor, Columbus,

Georgia, 31901 on the 17th of August, 2007,

beginning at 11:00 A.M.





    RUSSELL D. ANDERSON, CERTIFIED COURT REPORTER

                 P O BOX 2572

        COLUMBUS, GEORGIA  31902-2572

                (706) 327-3618

DEPOSITION OF: ALTON STILLWELL  8-17-07                    2

```
 1                    A P P E A R A N C E S

 2

 3

 4    FOR THE PLAINTIFF:

 5

 6

 7    HON. JAMES MOSS              205-278-7061

 8    P.  O. BOX 43219            205-278-7001

 9    BIRMINGHAM, AL 35243-3219

10

11

12    FOR THE DEFENDANT:

13

14

15    HON. KEVIN T. SHIRES

16    1707 - 29th COURT SOUTH

17    HOMEWOOD, AL  35209

18

19

20

21

22        RUSSELL D. ANDERSON, COURT REPORTER

23              P.  O. BOX 2572

24        COLUMBUS, GEORGIA  31902-2572

25              (706) 327-3618
```

DEPOSITION OF: ALTON STILLWELL 8-17-07

3

1                    D I S C L O S U R E

2   STATE OF GEORGIA
    COUNTY OF MUSCOGEE
3              Deposition of: PAUL ALTON STILLWELL

4        Pursuant to Article 8.B of the rules and
    regulations of the Board Of Court Reporting of the
5   Judicial Council of Georgia, I make the following
    disclosure:
6
         I am a Georgia Certified Court Reporter.  I
7   am here as a sole practitioner of ANDERSON COURT
    REPORTING.
8
         I was contacted by the offices of the Plaintiff
9   to provide court reporting services for the
    deposition.
10
         I will not be taking this deposition under
11  any contract that is prohibited by O.C.G.A.
    15-14-37 (a) and (b).
12
         I have no contract / agreement to provide
13  reporting services with any party to the case, any
    counsel in the case, or any reporter or reporting
14  agency from whom a referral might have been made to
    cover this deposition.  I will charge my usual and
15  customary rates to all parties in the case, and a
    financial discount will not be given to any party to
16  this litigation.

17
    _____, CCR# B-403
18  RUSSELL D. ANDERSON

19  Certified Court Reporter

20  OPTIONAL SIGNATURES:

21  _____        Date:_____

22  Attorney for Plaintiff/Complainant

23  _____        Date:_____

24  Attorney for Defendant/Respondent

25

STIPULATIONS

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel that the deposition of PAUL ALTON STILLWELL, may be taken before Russell D. Anderson, a Georgia Certified Court Reporter, at the offices of the Columbus Consolidated Government Center, 7th Floor, Columbus, Georgia, 31901, on the 17th of August, 2007, on or about 11:00 A.M.

IT IS STIPULATED AND AGREED, that the signature and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED, that it shall not be necessary for any objections to be made by counsel to any questions, except as to the form of the question and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED, that notice of filing of the deposition by the court reporter is waived.

1                          D-E-P-O-S-I-T-I-O-N

2                          PAUL ALTON STILLWELL

3       Having been first duly sworn, testified as follows:

4                          CROSS EXAMINATION

5       BY MR. MOSS:

6          Q.    Mr. Stillwell, this is Jim Moss, I

7       represent State Auto Property & Casualty Insurance

8       Company in the declaratory judgment action against

9       Stillwell Masonry in the Unites States District

10      Court for the Middle District of Alabama and I have

11      some questions for you in relation to that this

12      morning.

13          Have you ever given a deposition before?

14          A.    No I haven't.

15          Q.    All right, let me just mention a few

16      things, particularly since you and I are in

17      different places.

18          If you would please let me finish my question

19      before you answer so that we can have a clear

20      record, I would appreciate that.

21          If you do not understand a question that I ask

22      you please let me know and I'll be happy to rephrase

23      the question so that you and I have a common

24      understanding, otherwise if you answer the question,

25      I'm going to assume that you understood the question

DEPOSITION OF: ALTON STILLWELL 8-17-07                                    6

1  as I asked it, is that fair?

2        A.   Fair enough.

3        Q.   Okay.  And if you need to take a break for

4  any reason you just let me know that and we'll take

5  a break.

6        A.   Okay.

7        Q.   All right, now state your full name

8  please.

9        A.   Paul Alton Stillwell.

10        Q.   And your date of birth.

11        A.   9-11-49.

12        Q.   What is your Social Security Number?

13        A.   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.

14        Q.   What is your residence address Mr.

15  Stillwell?

16        A.   Physical address is 5458 Sanford Road,

17  Seale, Alabama.

18        Q.   What is your current occupation?

19        A.   Stillwell Masonry, Incorporated.

20        Q.   How long have you been with that company?

21        A.   Approximately; I can't tell you the dates,

22  but 13 or 14 years.

23        Q.   What is your position with the company Mr.

24  Stillwell?

25        A.   I'm owner.

1        Q.    All right, is the company incorporated?

2        A.    Yes, sir.

3        Q.    Where?

4        A.    Well, at my home and you know, the

5    corporation is in Alabama.

6        Q.    Yes, sir, that's what I was asking. And

7    the address, the physical address for the company

8    is the same as your residence address that you just

9    gave me?

10       A.    Yes, sir. I don't have an office.

11       Q.    Mr. Stillwell I have some questions for

12   you regarding the work that Stillwell Masonry

13   performed in relation to the building that was

14   constructed for Total Systems Services, Incorporated

15   in Columbus, Georgia. Is it okay if I refer to that

16   as the project?

17       A.    Certainly.

18       Q.    All right, so that will make it easier on

19   both of us. And that building is the subject of the

20   lawsuit that's pending against Stillwell Masonry and

21   other defendants in the Superior Court of Muscogee

22   County, Georgia that was filed back on August 10,

23   2005 correct?

24       A.    Correct.

25       Q.    Please tell me when Stillwell Masonry was

1    first contacted regarding the project over in

2    Columbus.

3         A.   Concerning what?

4         Q.   Well, concerning performing any work in

5    relation to construction of the building.

6         A.   Well, I don't understand.  When I bid the

7    job or when they had a problem with the job?

8         Q.   No, sir.  I'm talking about from the first

9    time that there was ever any awareness on Stillwell

10   Masonry's part that there was going to be a

11   construction project and that Stillwell Masonry was

12   going to be involved in that project?

13        A.   Sometime in the year of 2000, but I can't;

14   it's been you know, 5, 6 years ago.  I can't tell

15   you exactly, but sometime in the year of 2000.

16        Q.   Who contacted you?

17        A.   Denson Construction Company.

18        Q.   And in relation to the project, what was

19   Denson Construction's role?

20        A.   They were the General Contractor.

21        Q.   What was it that Denson Construction

22   asked Stillwell Masonry to do when it contacted

23   Stillwell, back in 2000?

24        A.   They wanted a labor only price on the

25   brick work and block work.

1        Q.    Did you prepare the estimate for the work
2   to be done?

3        A.    Well, it's done by piece per brick and per
4   block and I gave them a price per, a unit, per unit
5   price.

6        Q.    And were there other masonry
7   subcontractors that also bid on that project?

8        A.    I'm sure there were, but I mean that's
9   not; you know, just they call you; you give them a
10  price and they tell you, you know, if you got it or
11  not.  That's not public information.

12       Q.    Do you recall when you were notified?  And
13  when I say you, I'm talking about Stillwell Masonry,
14  that you would be awarded the Masonry work for that
15  project?

16       A.    Oh, yeah.  He called and told me I had the
17  job, yeah.

18       Q.    Do you recall when that was though, any
19  particular time?

20       A.    No, sir.  Just during the year of 2000.
21  I mean he told me I had the job, but as far as dates
22  and months, I can't remember that far back.

23       Q.    Was there a written agreement that
24  Stillwell Masonry entered with Denson Contracting
25  for the work to be performed at the T S S project?

1          A.    No, sir it was all verbal.

2          Q.    Who entered the agreement, the verbal

3    agreement on behalf of Stillwell?

4          A.    I did.

5          Q.    Okay.  And who did you enter the agreement

6    with on behalf of Denson?

7          A.    Earl Denson.

8          Q.    What was the scope of work that you and

9    Mr. Denson agreed upon for Stillwell on the project?

10         A.    Moneywise or you know?

11         Q.    Well, what I'm trying to find out is

12   what was the actual work that Stillwell Masonry was

13   enlisted to perform on that building and please

14   understand Mr. Stillwell, I'm not in the masonry

15   business, so if some of these questions seem a

16   little bit naive on my part forgive me, I'm just

17   trying to find out in laymans terms what was it that

18   you and Mr. Denson agreed that Stillwell Masonry

19   would do in relation to constructing that building?

20         A.    I was to furnish labor, scaffold,

21   insurance, clean up behind myself, and have the

22   brick cleaned to their satisfaction.

23         Q.    And when you say the brick, was that in

24   relation to constructing brick veneer walls?

25         A.    Yes, sir.

1    Q.   All right, was there any other masonry

2  work that Stillwell was to perform at the project?

3    A.   Yes, sir I built some block; it's like a

4  storm shelter on the inside of the billing to where

5  if there's was a tornado or something came up, to

6  get those kids in, but that was never brought up.

7  They had no problems with that particular part of

8  the job.

9    Q.   When did Stillwell Masonry actually begin

10  constructing the brick veneer walls on the project?

11    A.   To the best of my knowledge it was

12  sometime March of 2001.

13    Q.   When did Stillwell Masonry complete

14  construction of the brick veneer walls on the

15  project?

16    A.   To the best of my knowledge it was in June

17  of 2001.

18    Q.   Now I'm going to ask you a question that

19  you asked me a little while ago in relation to when

20  you first became aware of any problems related to

21  the building for T S S in Columbus, Georgia, the

22  project?

23    A.   When was I aware of it?

24    Q.   Yes, sir.  When was the first time that

25  any problems were brought to your attention?

1    A.    No one ever called me.  There was a
2    package tied to my gate at home one afternoon when
3    I came in from work and I can't tell you if it was
4    last year or the year before.  I don't know, maybe
5    it was last year.  I don't remember brother, to be
6    honest with you.
7        Q.    When you say a package, can you identify
8    for me what the package was?
9        A.    It was a Federal Express, you know,
10   envelope with all this documentation in there.
11       Q.    Was that in relation to the lawsuit that's
12   pending over in Muscogee County, Georgia?
13       A.    Yes it was.
14       Q.    All right, after Stillwell completed it's
15   work in June 2001, were you ever called back out to
16   perform any repair work of any nature?
17       A.    None whatsoever.
18       Q.    Any what I will call punchlist type items?
19   Was there any punchlist items that were brought to
20   your attention to address?
21       A.    No, sir.  It was not.
22       Q.    Between June 2001 and well, up to this
23   point in time, have you ever been back out to the
24   project?
25       A.    Yes, sir, me and my attorney, Barry

1   Notelner from Atlanta, you know, with State Auto
2   and an engineer from Georgia Tech spent
3   approximately five hours out there one day.
4       Q.   When was that?
5       A.   Oh, I can't remember the months and the
6   days.  Barry may know, but I want to say it was last
7   year.
8       Q.   Had you done any other projects with
9   Denson Contracting or Denson Construction, excuse
10  me, from June 2001, let's say up to August 2005?
11      A.   Yes, I've done some work for them.
12      Q.   Okay.  And did you also deal with Earl
13  Denson on these other projects?
14      A.   I done some work at his house for him,
15  personally.
16      Q.   When was that?
17      A.   Christmas was a year ago.  And then I done
18  some more last year on his house.
19      Q.   Did you have any other projects that you
20  were doing with Denson Construction back in 2001,
21  other than the building for T S S?
22      A.   No.
23      Q.   What about 2002?
24      A.   I can't remember to be honest with you.
25  I done prior to that job, I done a C,B & T Bank

1    for him out on Bradley Park Drive.  I done a tire

2    store after the Total Systems job.

3        Q.    When was that?

4        A.    It was last year.

5        Q.    When was the C B & T Bank job?

6        A.    99 or the latter part of 2000.

7        Q.    Any other projects that you can recall

8    other than what you've told me that you've done with

9    Denson Construction during this same time frame?

10       A.    Not right off the top.  If I think of

11   something during this point in time, I'll try to,

12   but I don't remember and don't hold me to those

13   dates because you know, that's not; it may be wrong,

14   but I did do the work.

15       Q.    Let me ask you this Mr. Stillwell; did

16   you and Mr. Denson ever have any conversation about

17   any problems that were occurring at the T S S

18   building?

19       A.    I brought to his attention on several

20   occasions that the exterior walls needed some type

21   of damp; not a damp proofing, but a felt, a Tyvek.

22   I told him that I couldn't believe that they're not

23   putting any kind of moisture barrier on a building

24   like this.  And he told me it didn't call for it.

25   To get the job done.

1      Q.   Now tell me when was this that you brought

2   this to his attention?

3      A.   During the duration of the job, you know,

4   while we were, you know, when I first started it and

5   I would mention it again.

6      Q.   So between March 2001 and June 2001?

7      A.   Correct.

8      Q.   You brought this to his attention?

9      A.   Correct.

10     Q.   And why was it that you brought this up

11  to Mr. Denson?

12     A.   Because I thought it was poor design and

13  you know, it just wasn't what I was used to working

14  around.

15     Q.   Well, what was the concern as far as the

16  design?

17     A.   The building had no felt or no Tyvek, no

18  moisture barrier between the brick and the wall of

19  the building.

20     Q.   What is the consequence of that?

21     A.   Well, brick are porous and this is

22  just my point of view; the building was designed

23  and engineered wrong.  It had no cornice.  You can

24  get a blowing rain against a brick wall and the

25  brick is going to leak after a period of time, and

1  with no moisture barrier between the brick and the

2  exterior and interior wall of the building you're

3  going to get water in the building.  It's just

4  common sense.

5      Q.    While you, while Stillwell was performing

6  it's work in constructing the brick veneer walls on

7  the building were there any problems that were

8  brought to your attention?

9      A.    No, sir.  Brought to my attention?

10     Q.    Yes, sir.

11     A.    No.  No.  Hun-hun (negative response).

12     Q.    From March 2001 up to August 10, 2005,

13 did you have conversation with anyone regarding any

14 problems with the building constructed for T S S?

15     A.    Like whom for instance?  Just in a general

16 conversation or somebody, you know, concerning who?

17     Q.    And that's; the question was meant to be

18 broad.  I'm just trying to find out if there was

19 any conversation at all that you had regarding

20 problems with that building from the time that

21 Stillwell Masonry finished it's work in June, 2001

22 through the date that this lawsuit was filed by

23 T S S against Stillwell on August 10, 2005.

24     A.    There was no conversations until, you

25 know, the lawsuit started and naturally, you know,

1    the subs, you know, we mentioned to each other the

2    pros and cons on it, but prior to the suit itself,

3    no, there wasn't nothing mentioned.

4        Q.   What do you mean the subs would mention

5    the pros and cons of it to each other?

6        A.   Well, the guy that put the windows in is a

7    friend of mine that lives down there and I've worked

8    with these people on other jobs, you know, through

9    the years and then, you know, you bump into each

10   other at lunch and what have you and you know, you

11   discuss what they think is wrong what you think is

12   wrong, what have you.  Just in general conversation.

13       Q.   Were there other than the State Auto

14   policies Mr. Stillwell, were there any other general

15   liability policies in effect for Stillwell Masonry

16   from 2000 through -- well, up to this point in time?

17       A.   No, sir.  And can I say this too, prior

18   to this job, I never had a problem, and after this

19   job, in the last 5 years I've never had a problem.

20       Q.   I'll tell you what Kevin, if y'all want

21   to take about a 5 minute break, and let me look at

22   my notes, I may have a few other questions to ask.

23       A.   That would be fine.

24       MR. MOSS:  Okay, thank you sir.

25

1              OFF THE RECORD.

2              ON THE RECORD.

3   BY MR. MOSS:

4       Q.   I imagine Mr. Stillwell is ready to get

5   this over with.

6       A.   Well, I'd just like to get it all

7   clarified, you know, it's been a long drawed affair.

8       Q.   I've got a few more questions that I do

9   need to ask you Mr. Stillwell.

10      A.   Yes, sir.

11      Q.   I just want to make sure I understand.

12  You'd agree with me this was a big project?

13      A.   Yes, sir it was.  I think the original

14  bid was like three point two million.

15      Q.   What problems are you aware of at this

16  point that exist with that building?

17      A.   Well, like I explained to you before, no

18  moisture barrier between the brick and the building

19  is 99 percent of the problem.

20      MR. SHIRES:  Well, Jim are you asking at this

21  time as we sit here today, because I think there's

22  been some remediation.  Are you saying when they

23  first allege that there was a defect in the

24  building?

25      A.   Are you asking me?

1   BY MR. MOSS:

2        Q.   What are you now aware of that were

3   problems that existed with that building?

4        A.   The sheathing, the Georgia-Pacific

5   sheathing that they used on the exterior of the

6   building, Georgia-Pacific has discontinued it since

7   that time because of so many problems with it.

8        Q.   Were there moisture intrusion problems

9   that existed with the building?

10       A.   Yes, sir the moisture and mildew, that

11  was the reason of it.  That was the problem.

12       Q.   And that was the same problem that you

13  were concerned about back in March 2001 to June

14  2001 when Stillwell Masonry was performing the

15  masonry work out there, right?

16       A.   Exactly.

17       Q.   Okay, is it your testimony Mr. Stillwell,

18  that you just didn't have any awareness of any

19  problems with that building between the time that

20  Stillwell Masonry completed it's work up to the

21  point that you received notice of the lawsuit?

22       A.   Exactly.

23       Q.   You had no conversations with any

24  subcontractors regarding any problems that existed

25  with that building?

1        A.    No, sir.  None whatsoever.

2        Q.    And you had no conversations with Denson

3   Construction regarding any problems that existed

4   with the building?

5        A.    I didn't call Earl till I got that big

6   letter in the mail and I went to his office the next

7   day and sat down and had a little talk with him

8   about it.

9        Q.    What did you observe when you went out

10   there to look at the building?

11        A.    Well, the interior of the building, the

12   wallpaper itself on the inside of the building was

13   mildewed terribly bad.

14        Q.    Any other observations that you made?

15        A.    No, sir other than, you know, the mildew

16   problem was the problem, because it was unsanitary

17   for those kids.

18        Q.    Can you think of any other projects that

19   you had done for Denson during that time period

20   that I mentioned to you, between 2001 through 2005?

21        A.    Not off the top of my head.  If I do

22   I'll call Kevin and tell him, but I don't remember

23   anything right now.

24        Q.    What about any subcontractors that

25   you worked with at the same time that you were

1   performing the masonry work at the project, any
2   projects that you worked with any other; with those
3   subcontractors during that same time frame?  Do you
4   understand what I'm asking?

5       A.   No I don't.

6       Q.   In other words, were there some other
7   subcontractors who were performing their trades
8   during that same time frame that Stillwell Masonry
9   was performing it's work and then y'all worked on
10  other projects after that one together?

11      A.   I'm fixing to start one shortly here in
12  about a week that the metal stud man worked on.
13  I can't remember his name off the top of my head,
14  but he's the one that put up the metal studs and
15  put the exterior sheathing on the building.

16      I'm fixing to go do a job with him, but I don't
17  remember doing one with him since then.

18      Q.   All right, now and just so I make sure
19  I understand, the problem that you were concerned
20  about back when you were doing the work, and I say
21  you, I mean Stillwell Masonry in March to June 2001,
22  was the absence of a vapor barrier that would lead
23  to moisture intrusion, is that right?

24      A.   Exactly right.

25      Q.   All right, anything else that you were

1    concerned about while you were doing the work?

2         A.   No, sir.  That was the biggest factor and

3    that, the way that they engineered the building

4    with no overhang, you know, no cornice whatsoever,

5    and it was built right down there on the river.

6         And in the Winter time, you know how you'll

7    get fog and moisture in on the river and it will

8    just sit there for days at a time.  They should

9    have took a lot of that into consideration, you

10   know, where the building was actually located.

11        The slab of the building to me was actually

12   engineered too low to the ground where water

13   couldn't drain away from it.  I would say at least

14   20 inches.  This is just me talking.

15        The other thing that came into play after

16   this, the landscaper, if you know what weep holes

17   are in the bottom of brick.

18        Q.   Yes, sir.

19        A.   They poured concrete where the land goes

20   going in the building.  They poured concrete over

21   the weeps.  The landscaper, you know, the yard

22   people, they put pinestraw and dirt over the weeps.

23        Q.   When did you become aware of this Mr.

24   Stillwell?

25        A.   You know, after we got into the, you know,

1   after the papers were started and everybody started

2   hunting the pros and cons on it.

3       And let me mention this to you.  Total Systems

4   dismissed the yard people, because they worked for

5   them.

6       Q.   When you say after the papers got; are

7   you talking again about the lawsuit over in Muscogee

8   County, Georgia?

9       A.   Yes, sir.  Yes, sir.  And then when me

10  and Barry and the Engineer from Georgia, you know,

11  we went through all the wall sections on the

12  drawings, and the wall sections on the drawings did

13  not call for any moisture barrier.  It was one

14  little detail in the specs that called for a

15  moisture barrier.

16      Q.   All right, but that's something that you

17  brought up to Denson back when y'all were doing the

18  work?

19      A.   Yes, sir, but let me say this, too.  They

20  had a team of inspectors, the Architect and Engineer

21  did.  These people were out of Texas that came every

22  month and inspected that building.

23      So I mean these people have been to college and

24  engineers and I mean they should know whether there

25  should have been a damned moisture barrier on the

1  building or not.

2      Q.   Was there anything else that you brought

3  to Denson's attention regarding construction of

4  those walls while Stillwell was performing it's work

5  on the project?

6      A.   No, sir.

7      Q.   I believe that's all the questions I've

8  got for you today Mr. Stillwell.

9      A.   All right, I appreciate it.

10                  DIRECT EXAMINATION

11  BY MR. SHIRES:

12     Q.   I want to ask just a couple of quick

13  questions.  Alton do you know when you said the

14  wallpaper had mildew in the building.

15     A.   Exactly.

16     Q.   Do you know when that began?

17     A.   It's in some of that paperwork Kevin.

18  I mean yeah, it was like in the 3 and a half to

19  4 years after the building was turned over to

20  Total Systems.

21     Q.   Okay, that's when it was discovered or

22  that's --.

23     A.   Right.  When it was discovered.

24     Q.   Or when you first heard about it?

25     A.   Well, I didn't hear about it till you

1    know, I got the, you know, those papers tied to my

2    fence.

3         Q.    Okay, let me ask you:   You finished your

4    work sometime in the summer of 2001 on the project

5    right?

6         A.    Somewhere around in June to the best of my

7    knowledge.

8         Q.    Okay, now you testified earlier that the

9    brick itself is somewhat porous, right?

10        A.    Sure brick are porous.

11        Q.    You know and it's been kind of dry lately,

12   but it generally rains every year down in Columbus,

13   right?

14        A.    Oh, yes.

15        Q.    So if I understand you, ever since you

16   had finished your work on the project the summer of

17   2001, some water whenever it rained would have been

18   able to seep through that brick into the building,

19   right?

20        A.    Water will go through any brick.

21        Q.    Okay, so it would have happened each year;

22   each time it rained; since there was no moisture

23   barrier, that water would have been able to get

24   through there whenever it rained, right?

25        A.    Well, I wouldn't say everytime when it

DEPOSITION OF: ALTON STILLWELL  8-17-07 _____    26

1  rained, but when you have a hard blowing rain like

2  we have in the March and spring.  Not everytime.

3  Not every rain, no.

4       Q.   Okay, but it would happen at least once a

5  year in your opinion, based upon your experience as

6  a brick mason?

7       A.   I would think so, yeah.

8       Q.   Okay.  Well, thank you Alton.  You have

9  a great weekend?

10       MR. MOSS:  Well, let me --.

11       A.   You too, Kevin.

12                     RE-CROSS EXAMINATION

13  BY MR. MOSS:

14       Q.   And let me just follow up.  You've

15  testified, that that's something that you were

16  aware of since the time that Stillwell Masonry

17  performed it's work on the project, correct?

18       A.   Well, I was aware of it and I brought

19  it to their attention, but I was instructed to

20  go on and finish my job.

21       MR. MOSS:  Thank you sir.

22       A.   Thank you.

23       MR. SHIRES:  Thanks Alton.  Have a great

24  weekend.

25.      A.   You too, Kevin.

27

1      Q.   All right.

2           DEPOSITION CONCLUDED.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEPOSITION OF: ALTON STILLWELL  8-17-07

1                           CERTIFICATE

2

3    STATE OF GEORGIA

4    COUNTY OF MUSCOGEE

5

6         I, Russell D. Anderson, a Georgia Certified

7    Court Reporter, in and for Muscogee County, Georgia,

8    do hereby certify that the aforegoing pages numbered

9    2 through 27, inclusive, contain a true and correct

10   transcription of the stenographic notes taken by me

11   on the 17th day of August, 2007, of the testimony of

12   PAUL ALTON STILLWELL, held at the offices of the

13   Columbus Consolidated Government Center, 7th Floor,

14   Columbus, Georgia, 31901, to the best of my skill

15   and ability.

16        I further certify that I am not of counsel, nor

17   am I related to the parties in this action, nor am I

18   in anywise interested in the result of said action.

19

20   WITNESS MY HAND, this 17th day of August, 2007.

21

22

23                      RUSSELL D. ANDERSON

24                      COURT REPORTER

25                      CERTIFICATE NO. B-403

RUSSELL ANDERSON, COURT REPORTER 706-327-3618